# 20-4097

In The

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

STEPHEN YANG,

*Plaintiff-Appellant-Respondent,*

v.

MIC NETWORK, INC.,

*Defendant-Respondent-Appellant.*

ON APPEAL FROM IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (FOLEY SQUARE)
1:18cv07628-AJN, HON. ALISOKN J. NATHAN (U.S.D.J.)

## Brief for Plaintiff-Appellant-Respondent

JAMES H. FREEMAN, ESQ.
LIEBOWITZ LAW FIRM, PLLC
11 Sunrise Plaza, Suite 305
Valley Stream, NY 11580
(516) 233-1660
jf@liebowitzlawfirm.com

*Attorneys for Plaintiff-Appellant-
Respondent*

## CORPORATE DISCLOSURE STATEMENT

N/A

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF JURISDICTION ................................................................. 3

ISSUES PRESENTED ...................................................................................... 4

STATEMENT OF THE CASE .......................................................................... 5

STATEMENT OF FACTS ................................................................................ 7

SUMMARY OF ARGUMENT ........................................................................ 14

STANDARD OF REVIEW .............................................................................. 16

ARGUMENT ................................................................................................... 19

POINT I:   MIC NETWORK'S USE OF THE PHOTOGRAPH WAS NOT
SUFFICIENTLY TRANSFORMATIVE, WAS COMMERCIAL
AND WAS IN BAD FAITH ............................................................ 19

A. THE DISTRICT COURT ERRED BY FINDING THAT MIC'S USE OF THE
PHOTOGRAPH WAS TRANSFORMATIVE AS A MATTER OF LAW ...................... 20

1. *Mic Primarily Used the Photograph as an "Illustrative Aid" to Describe
Rochkind and His Interview With the New York Post* ................................ 21

2. *Yang's Photograph of Rochkind is Not the Subject of Mic's News
Reporting Nor the Object of Any Controversy* .......................................... 26

3. *The District Court Erred by Determining As a Matter of Law that Mic
Transformed the Original Purpose of the Photograph* .............................. 33

4. *Reasonable Jurors Could Disagree About Whether Mic's Use Of The
Photograph Was Transformative* ................................................................ 39

5. *A Commercial News Organization's "Incidental" Use of Registered
Photographs Should Not Be Deemed Transformative* ............................... 43

B.  MIC'S USE WAS COMMERCIAL ....................................................................... 45

C.  MIC'S USE OF THE PHOTOGRAPH WAS IN BAD FAITH BECAUSE IT FAILED TO PROPERLY CREDIT YANG ................................................................ 46

POINT II:    YANG'S PHOTOGRAPH IS CREATIVE AND SHOULD BE ACCORDED APPROPRIATE WEIGHT ......................................... 48

POINT III:   MIC USED MORE OF THE PHOTOGRAPH THAN WAS NECESSARY ................................................................... 50

POINT IV:    MIC'S UNAUTHORIZED USE PLAUSIBLY CAUSED MARKET HARM ......................................................................... 54

POINT V:    THE DISTRICT COURT DID NOT PROPERLY WEIGH THE FOUR STATUTORY FACTORS ................................................... 61

POINT VI:   THE DISTRICT COURT OVERLOOKED MIC'S USE OF THE PHOTOGRAPH ON FACEBOOK................................................... 62

CONCLUSION .................................................................................................. 63

CERTIFICATE OF COMPLIANCE ..................................................................... 65

# TABLE OF AUTHORITIES

<u>CASES</u>

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe,*
  131 F. Supp. 3d 196, 210 (S.D.N.Y. Sept. 18, 2015) ......................................... 18

*Adjmi v. DLT Entm't Ltd.,*
  97 F. Supp. 3d 512 (S.D.N.Y. 2015) ................................................................... 42

*Arista Records, LLC v. Doe 3,*
  604 F.3d 110, 120 (2d Cir. 2010) ....................................................................... 17

*Ashcroft v. Iqbal,*
  556 U.S. 662, 678 (2009) .................................................................................... 16

*Associated Press v. Meltwater U.S. Holdings,*
  931 F.Supp.2d 537, 551 (S.D.N.Y. 2013) ................................................... passim

*Authors Guild v. Google, Inc.,*
  804 F.3d 202, 220 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 1658 (2016) ...... 17, 49

*Baraban v. Time Warner,*
  No. 99-cv-1569 (JSM), 2000 WL 358375 at *4 (S.D.N.Y. April 6, 2000) ........ 49

*Barcroft Media, Ltd. v. Coed Media Group, LLC,*
  No. 16-cv-7634 (JMF), 2017 WL 5032993 (S.D.N.Y. 2017) ..................... passim

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 570 (2007) .................................................................................... 16

*Blanch v. Koons,*
  467 F.3d 244, 251 (2d Cir. 2006) ............................................................... passim

*Boesen v. United Sports Publications, Ltd.,* No. 20 CV 1552 (ARR) (SIL), 2020
  WL 6393010, at *1 (E.D.N.Y. Nov. 2, 2020), *reconsideration denied*, 2020 WL
  7625222 (E.D.N.Y. Dec. 22, 2020) ................................................................... 39

*Brownmark Films, LLC v. Comedy Partners,*
  682 F.3d 687 (7th Cir. 2012) .............................................................................. 18

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
    196 F. Supp. 3d 395 (S.D.N.Y. 2016) ........................................................ passim

*Campbell v. Acuff– Rose Music, Inc.*,
    510 U.S. 569, 579 (1994) ........................................................................ passim

*Cariou v. Prince*,
    714 F.3d 694, 707 (2d Cir. 2013) ............................................................ passim

*Clark v. Transporation Alternatives, Inc.*,
    No. 18-cv-9985 (VM), 2019 WL 1448448 (S.D.N.Y. March 18, 2019) .... passim

*Coleman v. Home Box Office, Inc.*,
    No. 18-CV-3510 (MKB), 2019 WL 8645387, at *6 (E.D.N.Y. Aug. 6, 2019)
    ................................................................................................................ passim

*Cruz v. Cox Media Grp., LLC*,
    444 F. Supp. 3d 457 (E.D.N.Y. 2020)............................................................ 23

*Eldred v. Ashcroft*,
    537 U.S. 186, 190 (2003) .............................................................................. 43

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
    624 F.3d 106, 108 (2d Cir. 2010) .................................................................. 16

*Ferdman v. CBS Interactive Inc.*,
    342 F. Supp. 3d 515, 535 (S.D.N.Y. 2018) ............................................... passim

*Fitzgerald v. CBS Broad., Inc.*,
    491 F. Supp. 2d 177 (D. Mass. 2007) ........................................................... 56

*Harbus v. Manhattan Inst. for Policy Research, Inc.*,
    No. 19 CIV. 6124 (ER), 2020 WL 1990866, at *1 (S.D.N.Y. Apr. 27, 2020) ... 39

*Harper & Row Publishers, Inc.*,
    471 U.S. 539, 562 (1985) ........................................................................ passim

*Hirsch v. CBS Broad. Inc.*,
    No. 17 CIV. 1860 (PAE), 2017 WL 3393845, at *6 (S.D.N.Y. Aug. 4, 2017) . 18, 39

*Hirsch v. Complex Media, Inc.*,
  No. 18-cv-5488 (CM), 2018 WL 6985227, at *6 (S.D.N.Y., December 10, 2018)
  ................................................................................................................ passim

*Infinity Broadcast Corp. v. Kirkwood*,
  150 F.3d 104, 108 & n. 2 (2d Cir. 1998) ..................................................... passim

*Katz v. Google Inc.*,
  802 F.3d 1178, 1183 (11th Cir. 2015) ................................................................ 49

*Kelly-Brown v. Winfrey*,
  717 F.3d 295, 308 (2d Cir. 2013) ..................................................................... 17

*Kienitz v. Sconnie Nation LLC*,
  766 F.3d 756, 759 (7th Cir. 2014) .................................................................... 52

*Konangataa v. Am. Broadcasting Companies, Inc.*,
  No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)
  ................................................................................................................ passim

*LaChapelle v. Fenty*,
  812 F. Supp. 2d 434, 442 (S.D.N.Y. 2011) ....................................................... 17

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395, 403 (2d Cir. 2014) ..................................................................... 16

*Marcus v. Rowley*,
  695 F.2d 1171, 1175–76 (9th Cir.1983) ............................................................ 47

*May v. Sony Music Entm't*,
  No. 18-CV-2238, 2019 WL 2450973, at *14 (S.D.N.Y. Feb. 13, 2019) ............ 54

*McGucken v. Newsweek LLC*,
  464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020); *reconsideration denied*, No. 19 CIV.
  9617 (KPF), 2020 WL 6135733 (S.D.N.Y. Oct. 19, 2020) ............................... 22

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
  345 F. Supp. 3d 482, 508–09 (S.D.N.Y. 2018) ................................................. 57

*Monge v. Maya Magazines,*
688 F.3d 1164, 1175 (9th Cir. 2012) ............................................................. passim

*Monster Communications, Inc. v. Turner Broadcasting,*
935 F.Supp. 490, 494 (S.D.N.Y. 1996) ............................................................. 49

*Morris v. Guetta,*
2013 WL 440127, *10 (CD. Cal. Feb. 4, 2013) ................................................ 49

*Murphy v. Millennium Radio Grp. LLC,*
650 F.3d 295, 307 (3d Cir. 2011) ...................................................................... 22

*N. Jersey Media Grp. Inc. v. Pirro,*
74 F. Supp. 3d 605, 621 n.18 (S.D.N.Y. 2015) ................................................. 53

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
166 F.3d 65, 74–75 (2d Cir. 1999) .................................................................... 44

*Nunez v. Caribbean Int'l News Corp.,*
235 F.3d 18, 25 (1st Cir. 2000) ................................................................. passim

*NXIVM Corp. v. Ross Inst.,*
364 F.3d 471, 478 (2d Cir. 2004) .............................................................. passim

*Oracle Am., Inc. v. Google LLC,*
886 F.3d 1179, 1203 (Fed. Cir. 2018), *cert. granted,* 140 S. Ct. 520, 205 L. Ed.
2d 332 (2019) .................................................................................................... 46

*Otto v. Hearst Commc'ns, Inc.,*
345 F. Supp. 3d 412 (S.D.N.Y. 2018) ........................................................ passim

*Psihoyos v. Nat'l Exam'r,*
No. 97 CIV. 7624 (JSM), 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998) ... 52

*Richard Feiner & Co., Inc. v. H.R. Industries, Inc.,*
10 F.Supp.2d 310, 314 (S.D.N.Y. 1998) ........................................................... 45

*Ringgold v. Black Entertainment Television, Inc.,*
126 F.3d 70, 79 (2d Cir. 1997) .................................................................. passim

*Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*,
  672 F.2d 1095, 1099 (2d Cir.), *cert. denied*, 459 U.S. 826, (1982) ................... 43

*Sands v. What's Trending, Inc.,*
   No. 20-CV-2735 (GBD) (KHP), 2021 WL 694382, at *3 (S.D.N.Y. Feb. 23,
   2021)................................................................................................................ 23

*Schwartzwald v. Oath Inc.*,
   No. 19-CV-9938 (RA), 2020 WL 5441291, at *1 (S.D.N.Y. Sept. 10,
   2020), appeal withdrawn sub nom. 2020 WL 8173575 (2d Cir. Dec. 3, 2020).. 39

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
   756 F.3d 73, 85 (2d Cir, 2014) .................................................... 17, 22

*TCA Television Corp. v. McCollum*,
   839 F.3d 168, 177 (2d Cir. 2016) ............................................... passim

*United States v. Am. Soc. of Composers Authors & Publishers*,
   599 F.Supp.2d 415, 429 (S.D.N.Y. 2009) ........................................ 46

*Walsh v. Townsquare Media, Inc.*,
   464 F. Supp. 3d 570 (S.D.N.Y. 2020) ............................................ 39

*Yang v. Connected Ventures,*
   17-cv-5481-GBD (S.D.N.Y.) ...................................................... 13, 58

*Yang v. Evolve Media,*
   17-cv-5529-AJN (S.D.N.Y.) ...................................................... 13, 58

*Yang v. Guardian,*
   17-cv-6636-GBD (S.D.N.Y.) ...................................................... 13, 58

*Yang v. Hearst,*
   17-cv-7585-VEC (S.D.N.Y.)....................................................... 13, 58

*Yang v. Mic Network, Inc.*,
   405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) ..................................... 17

*Yang v. Oath Inc.,*
   17-cv-6728-VM (S.D.N.Y.) .......................................................... 13, 58

*Yang v. Onion, Inc.,*
   17-cv-5411-VEC (S.D.N.Y.) ........................................................ 13, 58

*Yang v. Someecards,*
   17-cv-7405-JFK (S.D.N.Y.) ......................................................... 13, 58

*Yang v. Uproxx,*
   17-cv-6880-JPO (S.D.N.Y.) ......................................................... 13, 58

*Yang v. Ziff Davis,*
   17-cv-6628-VSB (S.D.N.Y.) ......................................................... 13, 58

**STATUTES**

17 U.S.C. § 107.................................................................. passim
28 U.S.C. § 1291..................................................................... 4
28 U.S.C. § 1331..................................................................... 3
28 U.S.C. § 1338(a) ................................................................. 3

**RULES**

Fed.R.Civ. 12(b)(6)............................................................ passim

**TREATISES**

3 Nimmer § 13.05[A], at 13–72................................................ 46

## PRELIMINARY STATEMENT

This is a copyright infringement action involving a large media company's unauthorized use of a copyrighted posed-portrait photograph of Dan Rothkind (the "Photograph"), the subject of a satirical piece featured in the New York Post, titled *Why I Don't Date Hot Women Anymore* (the "NYP Article"). Plaintiff Stephen Yang ("Plaintiff" or "Yang") is a professional photojournalist in the business of licensing his works to media companies. Defendant Mic Network, Inc. ("Defendant" or "Mic") is a largescale internet news publisher which, at all relevant times, operated a commercial website, [www.mic.com](www.mic.com) (the "Website") and Facebook page.

Mic exploited the Photograph for commercial gain by using the Photograph as the banner-image on its Wesbite for a story it ran covering the NYP Article, entitled *Twitter Is Skewering The New York Post for A Piece on Why Man Won't Date Hot Women* (the "Mic Article"). The Photograph was published by the New York Post with clear credit to Yang. Mic, a sophisticated media company, was well aware that Yang was the owner of the Photograph. Despite this knowledge, instead of reaching out to Yang for a routine license, Mic employed a deliberate strategy to exploit the Photograph in a misguided attempt to work around licensing requirements, and then failed to even credit Yang as the author.

The District Court, the Honorable Alison J. Nathan, dismissed Yang's Amended Complaint on Rule 12(b)(6), finding that Mic's secondary use was transformative as a matter of law because Mic's article criticized Rochkind and the New York Post's treatment of Rochkind. Specifically, the District Court found that Mic transformed the purpose of the Photograph by casting Rochkind in a negative light rather than in the favorable light in which he was allegedly depicted by the New York Post's "serious" reporting. [JA-152 (noting that Rochkind's opinions on "hot women" were "reported seriously" by the New York Post).

But a reasonable jury could find otherwise. Certainly, some may read the NYP Article and regard it as literal presentation of Rochkind's story. But it's equally true that some may regard the NYP Article as "tongue-in-cheek" and satirical in its own right. Indeed, the District Court's decision acknowledges that at least one ordinary observer posited that the NYP Article "has to be a piece of satire." [JA-153; JA-60] Thus, such belief could plausibly be shared by a reasonable juror.

The point here is that determinations respecting notions of satire, often subtle or even subliminal in nature, should be reserved for the fact-finder. This factual question is far too complex and nuanced to decide on the face of the pleadings through visual inspection of the news articles alone. Moreover, there is no transformative effect when the secondary user republishes the Photograph for

the exact same purpose it was originally created: news reporting on the subject of the photograph. Defendant used the image to illustrate a news story about the identical subject matter and did nothing to alter the Photograph's meaning.

Mic's use also usurped the licensing market for Yang's Photograph which achieved widespread popularity based on the number of downstream articles inspired by the NYP Article. If such practice were permitted, it would relegate photojournalists to a single licensing fee of their most valuable images, namely those images used in controversial news stories that receive national attention. This would allow downstream news aggregators to commercially exploit the photographs of controversial news stories simply by "cropping" the photograph from the original licensed publication.

In short, the District Court prematurely decided the question of fair use without properly evaluating the statutory factors. Plaintiff respectfully submits that the District Court's overly broad application of the fair use doctrine should be rejected, and the Court should reverse the District Court's order dismissing the case under Fed.R.Civ.P. 12(b)(6) and remand this case for further proceedings.

## STATEMENT OF JURISDICTION

The District Court, Hon. Alison J. Nathan, had jurisdiction over the underlying copyright action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

3

On September 24, 2019, the District Court entered an Order dismissing the Complaint for failure to state a claim under the fair use doctrine, 17 U.S.C. § 107. [JA-147]

On November 9, 2020, the District Court entered an order denying Yang's motion for reconsideration and/or reargument under Local Rule 6.3 and denied Appellee's motion for fees and sanctions [JA-377]  On December 7, 2020, Yang timely filed his Notice of Appeal [JA-389]  On December 21, 2020, Appellee filed its Notice of Cross-Appeal [JA-391]  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether Mic's commercial use of the Photograph on its Website was sufficiently transformative as a matter of law to warrant a finding in favor of fair use on the first statutory factor, 17 U.S.C § 107(1).

2.     Whether Mic's use of the Photograph through a "composite screenshot" usurped the market for the Photograph for purposes of the fourth statutory factor, 17 U.S.C § 107(4).

3.     Whether the District Court failed to properly analyze the remaining statutory factors in light of its finding of transformative use.

4.     Whether reversal is warranted to address Mic's use of the Photograph

on its commercial Facebook page to drive traffic to its Website.

## **STATEMENT OF THE CASE**

• On August 21, 2018, Yang filed an action for copyright infringement against Mic, alleging that Mic displayed the Photograph on its Website without Yang's authorization.  [JA-11]

• On November 18, 2018, Yang filed an Amended Complaint in response to Mic's motion to dismiss for failure to state a claim. [JA-37]  The Amended Complaint sought statutory damages under 17 U.S.C. § 504(c).  [JA-42]

• On December 5, 2018, Mic Network filed its motion to dismiss the Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) on grounds of fair use, 17 U.S.C. §107. [JA-64]

• On December 19, 2018, Yang filed his opposition to the motion to dismiss.  [JA-105]

• On January 7, 2019, Mic Network filed its reply brief. [JA-135]

• On September 23, 2019, the District Court entered an Order dismissing the Amended Complaint for failure to state a claim under the fair use doctrine, 17 U.S.C. § 107. [JA-147]  Judgment was entered on September 25, 2019. [JA-162]

- On October 8, 2019, Yang filed his motion for reconsideration and/or reargument under Local Rule 6.3 and to vacate under Fed.R.Civi.P. 60(b)(1). [JA-163]

- On October 9, 2020, Mic Network filed its motion for attorneys' fees under 17 U.S.C. § 505 and sanctions against Yang's counsel pursuant to 28 U.S.C. § 1927 and/or the District Court's inherent power. [JA-174]

- On October 18, 2020, Mic Network filed its opposition brief to Yang's motion for reconsideration and/or reargument. [JA-219]

- On October 25, 2020, Yang filed his reply brief in further support of his motion for reconsideration and/or reargument. [JA-278]

- On November 13, 2020, Mic Network filed its reply brief in further support of its motion for fees and sanctions.  [JA-283]

- On November 9, 2020, the District Court entered an order denying Yang's motion for reconsideration and/or reargument and denying Mic Network's motion for attorneys' fees and sanctions [JA-377]

- On December 7, 2020, Yang timely filed his Notice of Appeal [JA-389]

- On December 21, 2020, Mic Network timely filed its Notice of Cross-Appeal. [JA-391]

**STATEMENT OF FACTS**

**A.      Plaintiff-Appellant Stephen Yang**

Plaintiff Stephen Yang is a New York-based professional photographer in the business of licensing his photographs to online and print media. [JA-38, ¶ 5]

**B.      Defendant-Appellee Mic Network, Inc.**

Mic is a sophisticated for-profit news publisher which, at all times relevant hereto, operated a website at the URL https://Mic.com (the "Website").  Mic also operates a Facebook page which it uses to promote articles that are published on the Website. [JA-63]

Mic generates substantial revenues from advertising on the Website that is determined, in large part, by the number of page-views or "clicks" the Website receives. [JA-40, ¶ 22]  The "sharing" of Mic's news stories on its social media platform is a substantial driver of page-views, and thus revenue, for Mic. [JA-40, ¶¶ 20-22].

**C.      Yang's Photograph of Dan Rochkind and Initial Publication in the New York Post**

In April 2017, Yang created a posed photographic portrait of a 40-year-old New York finance executive named Dan Rochkind.  [JA-38, ¶ 7; JA-44]  Yang created the Photograph for the purpose of commercial news reporting, as he took the Photograph while working on assignment for the New York Post.  [JA-38, ¶¶

7-8]  JA-113]  Yang then licensed the Photograph to the New York Post.  [JA-38, ¶ 8]

On April 12, 2017 the New York Post ran an article prominently featuring the Photograph, entitled *Why I Don't Date Hot Women Anymore.*  See URL https://nypost.com/2017/04/12/why-hot-people-arent-worth-dating/ (the"NYP Article"). [JA-38, ¶ 8; JA-46]  Yang's name was featured in a "gutter credit" (i.e., authorship attribution) identifying him as the photographer of the Photograph. [*Id.*]



The NYP Article was published in the "Living" section of the New York Post and detailed Rochkind's exploits as a thirty-something bachelor dating "20-something blond models" and his realization that "dating the prettiest young things had its drawbacks – he found them flighty, selfish and vapid."  [JA-46]  The NYP

Article discusses the higher divorce rates of good-looking people and describes Rochkind's decision to cease dating "swimsuit models" and instead marry a "merely beautiful woman, Carly Spindel."  [JA-46]  The NYP Article reveals that Rochkind is "enthusiastic about his decision to give up high-maintenance hotties." [JA-48][1]

## D.  Mic Network's Unauthorized Display of the Photograph on its Commercial Website and Facebook Page

On or about April 13, 2017, Mic Network ran an article on the Website that featured the Photograph, entitled *Twitter Is Skewering The New York Post for A Piece on Why Man Won't Date Hot Women* (the "Infringing Article").  [JA-39, ¶ 11, JA-57]

Mic Network prominently featured the Photograph as the banner image of the Infringing Article on the Website.  [JA-39, ¶ 12; JA-57]  The Photograph was used as part of a "composite screenshot" of the NYP Article which included the headline of the NYP Article and roughly top-half of the Photograph, showing Rochkind's face and chest. [JA-57]

---

[1] The NYP Article also describes the dating preferences of women who no longer seek to date "gorgeous guys," but instead prefer "'superballer' men with high-paying careers."  [JA-47, 48]



**Mic** ☰

on up to three dates a week, courting 2[...]
something blond models, but eventual[...]
realized that dating the prettiest young
things had its drawbacks — he found th[...]
flighty, selfish and vapid.

"Beautiful women who get a fair amou[...]
attention get full of themselves," he say[...]
"Eventually, I was dreading getting dinn[...]
with them because they couldn't carry [...]
conversation."

According to new research, Rochkind's

**hy I won't date hot**
**omen anymore**

ristian Gollayan
2, 2017 | 6:26pm

**Twitter is skewering the 'New York Post' for a piece
on why a man "won't date hot women"**

By Marie Solis | April 13, 2017

The text of the Infringing Article reads:

Men have different ways of showing their commitment to feminism. One courageous man, for example, is doing his part to smash the patriarchy by only dating average-looking women. Inspiring!

The New York Post published a piece Wednesday titled 'Why I Won't Date Hot Women Anymore,' profiling such a man: an insufferable private equity executive named David Rochkind. The 40-year-old Upper West Side resident humbly told the Post there was a time when he could have anyone he wanted, which meant he always went after the 'hottest girl you could find.'

Not anymore!

After learning that hot women can't 'carry a conversation,' Rochkind

reformed and started dating his fiancée, Carly Spindel, whom the Post calls a 'merely beautiful woman.'

As you can imagine, Twitter had some harsh words for the Rochkind and some words of advice for Spindel.

Rochkind joins the ranks of men like Dave Hon, the man who bravely penned the column 'Why I'll Never Date a Feminist' in September to similar outrage.

To these men and others we say: Boy, bye.

[JA-57-61]

Mic expropriated the Photograph directly from the NYP Article, which featured a clear gutter credit identifying Yang as the photographer. [JA-40, ¶ 16; JA-46]  As a sophisticated media company in the business of publishing copyright-protected content, Mic was aware of the gutter credit on the NYP Article, and Mic understood the gutter credit indicated that the Photograph was owned by Stephen Yang. [JA-40, ¶ 17]  Despite the gutter credit, Mic did not contact Yang or the New York Post for authorization to use the Photograph. [JA-40, ¶ 18]  Moreover, Mic Network failed to credit Yang when it re-published the Photograph on the Website [JA-57] or its Facebook Page. [JA-63]

Commercial advertisements appear adjacent to or below the Photograph on the Website. [JA 58, 61] The Photograph is also displayed on the Website in two embedded tweets within the body of the Infringing Article.  [JA-58-60]

In addition to the Website, Mic Network used the Photograph as the primary

banner image shown when the Infringing Article was shared on Mic Network's Facebook page. [JA-39, ¶ 12; JA-63]  Mic Network's use of the Photograph on its Facebook page, which provides a direct hyperlink to the Website, was a substantial driver of traffic to the Infringing Article.  [JA-39, ¶ 12; JA-40, ¶ 21]



Mic Network did not license the Photograph from Plaintiff for its article, nor did Mic Network have Plaintiff's permission or consent to publish the Photograph on its Website. [JA-39, ¶ 13]

**E.      Widespread Market Demand for the Photograph**

In the wake of the NYP Article, scores of other media outlets used the Photograph to comment on the underlying New York Post Article in a similar manner as Mic. [JA-172]  As such, the Photograph went "viral."  This resulted in a number of copyright infringement cases brought by Yang against third party media companies, all of which were resolved.  *See, e.g.*, *Yang v. Onion, Inc.,*17-cv-5411-VEC; *Yang v. Connected Ventures,* 17-cv-5481-GBD; *Yang v. Evolve Media,* 17-cv-5529-AJN; *Yang v. Ziff Davis,* 17-cv-6628-VSB*; Yang v. Guardian,* 17- cv-6636-GBD; *Yang v. Oath;* 17-cv-6728-VM*; Yang v. Uproxx,* 17-cv-6880-JPO*; Yang v. Someecards* 17-cv-7405-JFK; *Yang v. Hearst* 17-cv-7585-VEC. [JA-172]

**F.      Copyright Registration of the Photograph**

The Photograph, bearing content title "*Yang_Dan Rochkind, 4-12-17*", was timely registered with the United States Copyright Office and was given registration number VA 2-055-141, effective June 22, 2017. [JA-39, ¶ 10; JA-50]

## SUMMARY OF ARGUMENT

*First,* with respect to the first fair use factor, Mic's secondary use of the Photograph was not transformative because it primarily used the Photograph as an illustrative aid to comment on the subject matter depicted in the image: Rochkind. The Photograph itself was not the subject of Mic's story nor target of any criticism. At best, Mic has shown that its use was minimally transformative because it cropped out the lower half of the Photograph. But such low degree of transformativeness does not justify a fair use finding as a matter of law.

More importantly, the first factor presents a question of fact for the jury as to whether Mic imparted any new meaning or insight through use of the Photograph, particularly given that a reasonable juror could find that the NYP Article was satirical in its own right rather than a "serious" piece of news reporting. Although the District Court found that Mic's use was commercial and in bad faith, it did not balance those factors into its final analysis.

*Second*, the District Court accorded insufficient weight to the second factor, even after finding that the creative nature of the Photograph weighed against fair use.

*Third*, the District Court's analysis of the third factor did not take into account the multiple uses of the Photographs across several URLs, nor did it take

into account the qualitative copying made by Mic, showing that it valued the Photograph.

*Fourth*, in considering the market impact under the fourth fair use factor, the District Court overlooked the widespread popularity of the Photograph, demonstrating a robust market demand for Yang's work. By allowing Mic to escape liability through use of a "composite screenshot," Yang was not only deprived of a proper licensing fee from Mic, but the District Court provided downstream infringers a convenient technical end-run to avoid paying license fees through the snap creation of screenshots.

*Fifth*, the District Court did not analyze Mic's use of the Photograph on its Facebook page, a separate URL, which Mic used to drive traffic to its commercial Website. The District Court's transformative inquiry is not applicable to Mic's Facebook page, given that Mic offered no commentary at all but simply used the Photograph to link to Mic's Website.

**STANDARD OF REVIEW**

This Court reviews *de novo* a district court's dismissal for failure to state a claim, "accepting all factual allegations in the []complaint and its incorporated exhibits as true and drawing all reasonable inferences in plaintiff[']s favor." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 177 (2d Cir. 2016) (applying *de novo* standard to district court's dismissal of amended complaint based on fair use doctrine and finding that dismissal was not properly based on fair use.)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). "[T]he complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." *Arista Records, LLC v.*

*Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted).

"The determination of fair use is a mixed question of fact and law." *Swatch Grp. Mgmt. Servs. Ltd. V. Bloomberg L.P.,* 756 F.3d 73, 81 (2d Cir. 2014). It is an "open-ended and context-sensitive inquiry" that is "fact-driven[ ]" *LaChapelle v. Fenty,* 812 F. Supp. 2d 434, 442 (S.D.N.Y. 2011); *see also Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 577 (1994) ("the [fair use] statute, like the doctrine it recognizes, calls for case-by-case analysis"). In rebutting a defendant's fair use argument on a Rule 12(b)(6) motion, a plaintiff is "held only to the usual burden of a motion to dismiss . . . which is to say [he] must plead sufficient facts to plausibly suggest that they are entitled to relief." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013).

"Fair use is an affirmative defense, and therefore Defendant bears the burden of showing that a given use is fair." *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015)). "Because fair use is an affirmative defense, it often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss." *Kelly-Brown*, 717 F.3d at 308; *see also Coleman v. Home Box Office, Inc*., No. 18-CV-3510 (MKB), 2019 WL 8645387, at *6 (E.D.N.Y. Aug. 6, 2019) ("Further development of the record is needed to clarify

where Defendants obtained Plaintiff's work and to identify the intended purpose behind the Film's use of the Work and what, if any, new insights and understandings are created by Defendants' use."); *Hirsch v. CBS Broad. Inc.*, No. 17 CIV. 1860 (PAE), 2017 WL 3393845, at *6 (S.D.N.Y. Aug. 4, 2017) (denying the defendant's motion to dismiss because further development of the record was needed to clarify whether the defendant's use of a copyrighted photograph in a video created new insights and understandings); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe*, 131 F. Supp. 3d 196, 210 (S.D.N.Y. Sept. 18, 2015) ("the invocation of the fair use doctrine necessarily raises questions of fact that cannot be resolved on a motion to dismiss").

Nevertheless, this court has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim. *See Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (granting defendant partial summary judgment on fair use and citing approvingly to *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012) (rejecting argument that fair use could not be decided on motion to dismiss)).

On *de novo* review here, Yang respectfully submits that the Court should conclude that Mic's entitlement to a fair use defense was not so clearly established on the face of the complaint and its incorporated exhibits as to support dismissal. *See TCA Television Corp.,* 839 F.3d at 178.

## ARGUMENT

Section 107 of the Copyright Act sets out four non-exclusive factors to

consider in determining whether a defendant's use of a copyrighted work is a fair

use. These are "(1) the purpose and character of the use, including whether such

use is of a commercial nature or is for nonprofit educational purposes; (2) the

nature of the copyrighted work; (3) the amount and substantiality of the portion

used in relation to the copyrighted work as a whole; and (4) the effect of the use

upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

In reviewing the challenged determination of fair use in this case, the Court

is to address these factors individually, while at the same time heeding the

Supreme Court's instruction that the factors must be viewed collectively, with their

results "weighed together, in light of the purposes of copyright." *TCA Television

Corp.,* 839 F.3d at 179 (citing *Campbell,* 510 U.S. at 578)

As set forth below, examination of these factors demonstrates that Mic

Network's use of the Photograph does <u>not</u> constitute fair use (or at the very least,

the District Court prematurely decided the issue as a matter of law in the absence

of a factual record).

**POINT I:   MIC NETWORK'S USE OF THE PHOTOGRAPH WAS NOT
SUFFICIENTLY TRANSFORMATIVE, WAS COMMERCIAL
AND WAS IN BAD FAITH**

The first factor under 17 U.S.C. § 107(1), which addresses the purpose and character of the secondary use, is the "heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

Courts within the Second Circuit examine three sub-factors to determine the purpose and character of use, including whether the secondary use is: (1) transformative; (2) for commercial purposes; and (3) in bad faith. *See, e.g.*, *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 478 (2d Cir. 2004). As per below, the transformative inquiry was resolved prematurely and the other two factors, commerciality and bad faith, weigh heavily against a finding of fair use.

## A.   THE DISTRICT COURT ERRED BY FINDING THAT MIC'S USE OF THE PHOTOGRAPH WAS TRANSFORMATIVE AS A MATTER OF LAW

The fair use doctrine "allows for new transformative works that further the public discourse and the free exchange of ideas in order to promote science and the arts." *See Campbell v. Acuff– Rose Music, Inc.*, 510 U.S. 569, 579 (1994). The central purpose of the inquiry is to determine whether "the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) (citations omitted). The Court should also inquire as to "whether the new work uses the copyrighted material itself for a purpose, or

imbues it with a character, different from that for which it was created." *TCA Television Corp.*, 839 F.3d at 180.

The District Court determined that Mic's use of the Photograph on the Website was transformative for three reasons: (i) the Photograph was used as part of a composite screenshot to "identify the subject of the controversy – the Post Article – and to illustrate why the article has been controversial" [JA-152]; (ii) the Mic Article "mocks the [New York] Post's presentation of the subject," as well as Rochkind himself [JA-153]; and (iii) "the Mic Article used the Photograph to place Rochkind in a harshly negative light, while the original use of the Photograph placed him in a positive, or at least neutral light." [JA-154]

For the reasons set forth below, Yang respectfully submits that the District Court erred in determining as a matter of law that Mic's use of the Photograph was sufficiently transformative as a matter of law.

1. **Mic Primarily Used the Photograph as an "Illustrative Aid" to Describe Rochkind and His Interview With the New York Post**

Although the preamble to section 107 of the Copyright Act cites news reporting as a preferential use, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'" *Harper & Row*, 471 U.S. at 557. As such, under Second Circuit law, "a news organization . . . may not freely copy creative expression solely because the

expression itself is newsworthy." *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 85 (2d Cir, 2014); *see also BWP Media USA*, Inc. v. Gossip Cop Media, Inc., 196 F. Supp. 3d 395, 406 n.6 (S.D.N.Y. 2016) ("Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.").[2]

In cases where news organizations use photographs as illustrative devices to comment on the content depicted in the image, courts in this Circuit have consistently determined that such use is <u>not</u> transformative. *See, e.g., McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020); *reconsideration denied*, No. 19 CIV. 9617 (KPF), 2020 WL 6135733 (S.D.N.Y. Oct. 19, 2020) (finding that transformative effect could not be determined as a matter of law on a Rule 12 motion where the photograph "was incorporated into the Article merely as an illustrative aid."); *Hirsch v. Complex Media, Inc.*, No. 18-cv-5488 (CM), 2018 WL 6985227, at *6 (S.D.N.Y., December 10, 2018) (denying Rule 12 motion on fair use where court found that news organization used a New York Post photograph of a convicted criminal primarily to describe the events surrounding his

---

[2] *Accord Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 307 (3d Cir. 2011) ("News organizations are not free to use any and all copyrighted works without the permission of the creator simply because they wish to report on the same events a work depicts.")

sentencing); *Sands v. What's Trending, Inc.,* No. 20-CV-2735 (GBD) (KHP), 2021 WL 694382, at *3 (S.D.N.Y. Feb. 23, 2021) (finding that news organization's re-publication of a photograph depicting actor Joaquin Phoenix on the movie set of the "Joker" was not transformative because it "did not offer a critique of the Photograph", nor "portray Phoenix or the film in a different light than Plaintiff's original purpose."); *Cruz v. Cox Media Grp., LLC*, 444 F. Supp. 3d 457 (E.D.N.Y. 2020) (secondary use of a photograph of the Battery Park terrorist suspect held not transformative where news organization published a descriptive report of the arrest); *Otto v. Hearst Commc'ns, Inc.,* 345 F. Supp. 3d 412 (S.D.N.Y. 2018) (Hearst's use of photograph of President Trump crashing a wedding held not transformative because the photograph itself was not the object of any controversy); *Barcroft Media, Ltd. v. Coed Media Group, LLC*, No. 16-cv-7634 (JMF), 2017 WL 5032993 (S.D.N.Y. 2017) (finding use of celebrity photographs were not transformative when used as an "illustrative aid"); *Psihoyos v. Nat'l Exam'r*, No. 97 CIV. 7624 (JSM), 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998) (where photograph of a customized car was republished in a news article, publisher's "use is not transformative, because its piece uses the photo to show what it depicts.").[3]

---

[3] *See also Monge v. Maya Magazines,* 688 F.3d 1164, 1175 (9th Cir. 2012) (rejecting fair use defense where "the controversy here has little to do with photos; instead, the photos here depict the couple's clandestine wedding.").

Here, the District Court acknowledged the prevailing view that "if a photograph is merely used as an 'illustrative aid' that 'depicts the subject[s] described in [an] article[],' this does not constitute transformative use." [JA-151 (quoting *Barcroft Media,* 2017 WL 5032993)] But the District Court nonetheless determined that Mic Network used the Photograph of Rochkind for purposes of criticizing Rochkind, rather than illustrating him. [JA- 153] Plaintiff respectfully submits that the District Court's finding is erroneous because Mic's second-hand reporting of Rochkind is primarily descriptive.

For example, the Mic Article describes Rochkind as "a private equity executive named David [sic] Rochkind" and a "40-year-old Upper West Side resident." [JA-57] Mic describes what Rochkind told the New York Post about his history of dating beautiful women and how he had reformed after learning that "hot women can't carry a conversation". [JA-57] Mic further describes how Rochkind thereafter started dating his finance, Carly Spindel. [JA-57] Indeed, the majority of the text accompanying Mic's display of the Photograph on the Website merely describes Rochkind and the statements he made to the New York Post. [JA-57]

The case at bar is therefore analogous to *McGucken v. Newsweek*, where the court denied a Rule 12(b)(6) motion on fair use after determining that it could not be found "as a matter of law that Defendant's use of the photograph was transformative." 464 F. Supp. 3d at 606. Specifically, the court found Newsweek

had used a photograph of a lake in Death Valley National Park "<u>primarily</u> as an illustrative aid depicting the subject of the Article." *Id.* (underlined added). Although Newsweek's article incorporated quotes from McGucken about the taking of his photograph, the court emphasized that "the mere addition of some token commentary is not enough to transform the use of a photograph when that photograph is not itself the focus of the article." *Id.*

Similarly, in *Hirsch v. Complex Media*, a commercial news organization expropriated the plaintiff's photograph of Santino Boderick, a criminal associate of rapper Bobby Shmurda, from the New York Post. 2018 WL 6985227, at *5-6. Complex incorporated the photograph into a video segment which provided commentary about the Shmurda case and compared the convictions of Shmurda and his associates, including Boderick. *Id.* The court determined that "Complex has not established that its Video did anything more than merely describe the subject of Hirsch's Photograph, newsworthy or not. That conduct alone does not suffice as transformative." *Id.* at *6. The court also found that "[f]urther development of the record is needed to clarify what, if any, new insights and understandings were created by Complex's use of the Photograph such that the Video "imbue[d] [the Photograph] with a character[ ] different from that for which it was created." *Id.* (citing *TCA Television Corp*, 839 F.3d at 180).

Here, like the Newsweek article in *McGucken* and Complex video in *Hirsch*,

Mic primarily used the Photograph on the Website as an illustrative aid to describe Rochkind and his interview with the New York Post.

Further, as explained below, the criticism that Mic included in its article was directed at Rochkind - the subject matter of the Photograph - rather than at the copyrighted work itself. Whether such criticism added "new information, new aesthetics, new insights and understandings," *Castle Rock*, 150 F.3d at 141, to the image in furtherance of "the Progress of Science and useful Arts." U.S. Const., Art. I, § 8, cl. 8, should not have been decided as a matter of law on the face of the pleadings.

**2.      Yang's Photograph of Rochkind is <u>Not</u> the Subject of Mic's News Reporting <u>Nor</u> the Object of Any Controversy**

In *Barcroft Media*, the court explained that the preferential treatment accorded to "news reporting" under the preamble to Section 107 applies to news reporting about the copyrighted work itself; not to news reporting about the subject matter depicted in the image. *Barcroft Media,* 2017 WL 5032993 at *6 (in the context of news reporting, a photograph may be transformed where "the copyrighted work is itself the subject of the story, transforming the function of the work in the new context."); *see also BWP Media,*196 F. Supp. 3d at 406 n.6 ("Defendant confuses the situation in which the photograph is the story . . . and the scenario present here, in which the contents of the photograph are of some public

interest . . . ); *McGucken*, 464 F. Supp. 3d at 606 ("[U]se of a copyrighted photograph in a news article can properly be deemed transformative where the photograph itself is the subject of the story.").

Thus, "a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or appropriateness of the photograph." *Barcroft Media,* 2017 WL 5032993 at *6 (*citing Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000) (fair use found where salacious photographs of Miss Puerto Rico Universe were published by newspaper to comment on the political controversy surrounding the existence of the photographs and their impact on the beauty queen's qualifications to retain the crown); *Konangataa v. Am. Broadcasting Companies, Inc.,* No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017) (fair use found where publishers reported on social controversy surrounding a father's lack of discretion in posting a live-streaming video that graphically depicted the birth of his child)).

Here, the District Court determined that Mic transformed the Photograph because it mocked Rochkind, as well as the New York Post's treatment of Rochkind.  [JA-153]  But in the context of commercial news reporting, the secondary user's commentary must be directed at or about the copyrighted work itself, i.e. the Photograph. *Barcroft Media*, 297 F. Supp. 3d at 352 ("CMG's articles did not comment on, criticize, or report news *about the Images themselves*;

instead, they used the Images as illustrative aids because they depicted the subjects described in its articles. CMG's argument, if accepted, would eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law.")[4]

The record here shows that it is not Yang's *photograph* of Rochkind that is subject to controversy; rather, it is Rochkind himself and the comments he made to the New York Post. The District Court's decision plainly conflates Yang's copyrighted work with the subject matter depicted in the work.

For example, the District Court found that Mic "was using the Screenshot to identify the subject of controversy – the Post Article – and to illustrate why the article has been controversial." [JA 151-52] The District Court also stated that the "Mic Article mocks the Post's presentation of the subject, using the Screenshot to both identify the target of its criticism and as a basis for criticism." [JA-153] The

---

[4] Defendant may cite to the Court's decision in *Cariou*, for the proposition that "[t]law imposes no requirement that a work comment on the original or its author in order to be considered transformative, and a secondary work may constitute a fair use even if it serves some purpose other than those (criticism, comment, news reporting, teaching, scholarship, and research) identified in the preamble to the statute." 714 F.3d at 706. But *Cariou* did not involve one of the preferential uses identified in the preamble to section 107. Instead, *Cariou* addressed a case of "art appropriation," where the secondary use involved substantial aesthetic alterations to the original image. But in cases such as the present involving literal, wholesale reproductions of the original work in the news reporting context, the Court should require that the photograph itself be made the object of the comment, criticism or scholarship to qualify for a finding of transformativeness.

subject of the Mic Article, as per the District Court, "is the backlash to the Post Article" and the "Mic Article itself consists in large part of embedded tweets criticizing the Post Article, the way the Post Article presents Rochkind, and Rochkind himself."  [JA-152]

But the District Court did not find that the Photograph itself was in any way subject to controversy, as was the case in *Nunez* and *Konangataa*, where the publishers reported on a public controversy sparked by the very existence of the images.  A cursory glance at the Mic Article reveals that Defendant offered no commentary or criticism directed at the Photograph itself, nor was there any news reporting about the Photograph.  [JA-57]  Instead, the controversy addressed by Mic surrounded the NYP Article in general and, more particularly, the text contained within that article.

But Yang does not claim any rights to the NYP Article or its literary text. NYP Holdings, Inc., which operates the New York Post, is the presumptive copyright holder of the text printed in the NYP Article. Yang's ownership interest resides in the Photograph itself, which the Copyright Act refers to as a "pictorial work."  *See* 17 U.S.C. § 101 ("'Pictorial, graphic, and sculptural works' include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans."); compare *id.* ("'Literary

works' are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied."). The District Court improperly conflated the "pictorial work" at issue in this lawsuit with a "literary work" to which Yang has no claim to ownership.

As noted, the cases cited by the District Court in support of its position all involve controversies surrounding the very existence of a pictorial work, *see Nunez*, 235 F.3d at 25 (fair use found where salacious photographs of Miss Puerto Rico Universe became the subject of controversy to determine whether she was qualified to retain the crown); or an audio-visual work, *see Konangataa,* 2017 WL 2684067, at *1 ("Defendants and other news outlets reported on the Video [of a woman giving birth] and offered social commentary about the phenomenon of someone publicly live-streaming a life event that traditionally is considered personal."). In both cases, the plaintiff was the owner of the photograph or video that was subject to controversy.

Here, in contrast, the Mic Article addresses a controversy surrounding a separate literary work which is not owned by Yang. The District Court has essentially treated the New York Post's literary work and Yang's pictorial work as a unified work. But the Copyright Act does not prescribe this unification, nor

does the primary case cited by the District Court, *Barcroft Media,* support the conflation of two separate works into a single work for purposes of criticism or commentary. After all, Mic could have conveyed the exact same message in terms of criticizing Rochkind or the Post by taking a screenshot of the NYP Article headline without using Plaintiff's photograph.[5]

The District Court's reliance on *Clark v. Transporation Alternatives, Inc.*, No. 18-cv-9985 (VM), 2019 WL 1448448 (S.D.N.Y. March 18, 2019) is also misplaced. There, the Honorable Victor Marrero granted a motion to dismiss on grounds of fair use where a defendant not-for-profit organization re-published a photograph from the New York Post to comment on the New York Post's treatment of dockless bicycles. Significantly, the defendant's article not only criticized the New York Post article in general, but it specifically criticized the New York Post's editorial decision to select the photograph in question. *Id.* at *1-3 ("the TransAlt Article notes that the *Post* made a poor choice in selecting the Photograph -- which shows a dockless bicycle neatly parked on the sidewalk's edge, leaving ample room to walk by -- to accompany the *Post* Article, because instead of serving its purpose of proving the *Post* Article's thesis that dockless

---

[5] A photograph should not lose copyright protection simply because it is published in conjunction with a literary work that has been criticized by secondary publishers. If that were the case, then secondary publishers could just rip off whatever photographs they like based on some trivial controversy raised by an accompanying literary work.

bikes are 'clogging NYC sidewalks,' the Photograph may actually refute the proposition . . . . As used in the TransAlt Article, then, the Photograph is no longer just a depiction of a dockless bicycle, but a sly barb at the *Post*'s sloppy journalism").[6]

Here, in contrast to *Clark*, the Mic Article did not criticize the New York Post's editorial selection of Yang's Photograph.  [JA-57]  Indeed, the text accompanying the Mic Article makes no reference whatsoever to the Photograph.  [JA-57-61]  Defendant concedes in its brief below that use of the Photograph on Mic's Website was merely "incidental."  [JA-194]

 But in *Clark*, the defendant's use of the photograph was essential because the criticism was aimed at the New York Post's editorial selection of that specific photograph.  *Clark* at *1-3.  As was the case in *Nunez* and *Konangataa,* the copyrighted pictorial work itself in *Clark* was the subject of the story. Accordingly, *Clark* does not provide a sound basis to dismiss Yang's complaint as a matter of law.

In sum, the Mic Article primarily targets Rochkind himself as the object of its criticism, rather than the merits of Plaintiff's pictorial rendition of Rochkind or the New York Post's editorial decision to use that specific Photograph. Defendant is free to offer its opinion as to whether Rochkind is "insufferable", but it must

---

[6] It is also notable that defendant provided attribution to Clark, the plaintiff in that action.

secure a license from the rights holder to display Yang's pictorial rendition of Rochkind on its commercial Website and Facebook page.

### 3. The District Court Erred by Determining As a Matter of Law that Mic Transformed the Original Purpose of the Photograph

"[U]se of copyrighted material that 'merely repackages or republishes the original is unlikely to be deemed a fair use' and a 'change of format, though useful' is not transformative." *Associated Press v. Meltwater U.S. Holdings*, 931 F.Supp.2d 537, 551 (S.D.N.Y. 2013) (*quoting Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 & n. 2 (2d Cir. 1998) (citation omitted)).

A secondary use has "no transformative effect [where the article] display[s] the Images in the same manner and for the same purpose as they were originally intended to be used." *Barcroft Media,* 2017 WL 5032993, at *6; *see also Psihoyos,* 1998 WL 336655 at *3 (rejecting fair use defense where purpose of secondary use was to display it "for precisely a central purpose for which it was created"). "Even an infringer's separate purpose, by itself, does not necessarily create new aesthetics or a new work that alter[s] the first [work] with new expression, meaning or message." *Monge* at 1176.

Here, Defendant did not transform the purpose of the Photograph, which was originally created by Yang for news reporting by the New York Post [JA-38, ¶¶ 7-8] and then re-published by Defendant for the same purpose of commercial

news reporting. [JA 39, ¶¶ 11-12] Thus, there can be no dispute that Defendant re-published the Photograph on its Website for the identical purpose as Yang originally intended.

The case at bar is therefore distinguishable from *Nunez*, where the photographs of Miss Puerto Rico were originally created for a fashion model portfolio, and then converted to the separate purpose of news reporting. As noted by the First Circuit:

> what is important here is that plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper; the former use, not the latter, motivated the creation of the work. Thus, by using the photographs in conjunction with editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. It is this transformation of the works into news—and not the mere newsworthiness of the works themselves—that weighs in favor of fair use under the first factor of § 107.

*Nunez*, 235 F.3d at 23; *see also McGucken*, 464 F. Supp. 3d at 606 ("What was important in *Nunez* was that the defendant imbued the plaintiffs' photographs with new meaning by transforming them from their original intent — modeling photographs — into the subject of a news story.")

Here, because Yang's Photograph was originally intended to appear as news reporting in the "Living" or lifestyle section of the New York Post [JA-46], and was merely re-reported by Mic in the parallel context of lifestyle news reporting [JA-57], it cannot be fairly stated that Mic transformed the purpose of the image.

Notwithstanding the fact that Mic used the Photograph for the same purpose originally intended, the District Court determined that Mic transformed the Photograph as a matter of law because: (i) the Photograph was necessary to identify the controversy surrounding the New York Post article [JA-153]; (ii) Mic criticized the New York Post's treatment of Rochkind, as well as Rochkind himself [JA-153]; and (iii) Mic used the Photograph "to place Rochkind in a harshly negative light, while the original use if the Photograph placed him in a positive, or at least neutral light." [JA-154]

<u>First</u>, with respect to the notion that Mic's use of the Photograph was necessary to identify the controversy surrounding the New York Post article "and to illustrate why the article has been controversial" [JA-152], Yang respectfully disagrees. Mic could have identified the NYP Article by simply taking a screenshot of the stand-alone headline. Or it could have simply relied on the text-based hyperlink to the NYP Article, which was provided in the third sentence of the Mic Article [JA-157] Although a picture equals a thousand words, the use of words here were all that was necessary to identify the NYP Article and the controversy surrounding it.

<u>Second</u>, with respect to the District Court's ruling that Mic transformed the purpose of the Photograph by criticizing the New York Post's treatment of Rochkind, as well as Rochkind himself, such criticism is unrelated to the specific

photograph in question. [See Point I.A.2, *supra*]   Mic could have used any photograph of Rochkind to criticize Rochkind and did not need to use Yang's professional Photograph to achieve that aim. Unlike the case in *Clark*, where the composite screenshot was integral to the defendant's criticism of the New York Post's selection of the specific photograph in question, the Photograph in this case was not itself the subject of the Mic Article nor the target of Mic's criticism.

Third, the District Court erred by determining as a matter of law that Mic transformed the purpose of the Photograph by casting Rochkind in a negative light rather than in a favorable or neutral light. [JA-154]  This is precisely the kind of nuanced question that should be reserved for the fact-finder.

The District Court's conclusion presupposes, without any development of a factual record, that the NYP Article about Rochkind is a "serious" piece of news reporting. [JA-152 (noting that Rochkind's opinions on "hot women" were "reported seriously" by the New York Post). But a reasonable jury could find otherwise.  Certainly, some may read the NYP Article and regard it as literal presentation of Rochkind's story.  But it's equally true that some may regard the NYP Article as "tongue-in-cheek" and satirical in its own right.

Even the New York Post headline: "*Why I won't date hot women anymore*" is an oxymoronic proposition given that American popular culture often accords elevated status to men who date "hot women."  So just by the headline alone, the

New York Post author has invited readers to contemplate the amusing contradiction of Rochkind: a straight man who prefers *not* to date "hot women." Indeed, the District Court's decision acknowledges that at least one ordinary observer posited that the NYP Article "has to be a piece of satire." [JA-153; JA-60] Thus, such belief could plausibly be shared by a reasonable juror.[7]

Unlike a piece of conventional news reporting, the tone of the NYP Article is whimsical and satirical, using colorful banter and street vernacular to describe Rochkind's exploits. For example, the author starts by stating that Rochkind "had no problem snagging the city's most beautiful women" [JA-46] In characterizing Rochkind, the New York Post author goes on to jest that Rochkind "eventually realized that dating the prettiest young things had its drawbacks" [JA-47] and adds that "Rochkind is equally enthusiastic about his decision to give up high-maintenance hotties." [JA-48] The author also quips: "Dan Rochkind used to date swimsuit models, but he's happier now that he's engaged to a merely beautiful woman." [JA-47] A sophisticated reader of the NYP Article could readily conclude that the author is mocking or "sending up" Rochkind, rather than portraying him in a favorable light.

---

[7] The District Court's ultimate conclusion that a "reasonable viewer would interpret the Photograph in [the NYP Article] as placing Rochkind in a flattering, or at the very least neutral light" [JA-155] is therefore belied by the record evidence showing that at least one ordinary observer thought the NYP Article was "a piece of satire." [JA-60]

The District Court found as a matter of law that the NYP article portrayed Rochkind in a "favorable" or "neutral" light. [JA-154] But the District Court has overlooked the rhetorical devices used by the New York Post author to make fun of Rochkind. The author is engaging in the rhetorical device of "deadpan". *See* https://en.wikipedia.org/wiki/Deadpan (defined as "the deliberate display of emotional neutrality or no emotion, commonly as a form of comedic delivery to contrast with the ridiculousness or absurdity of the subject matter.") The NYP Article may present as neutral on its face, with its citation to Harvard university studies [JA-47], but a reasonable juror could find that the author's treatment of Rochkind is quite satirical and even portrays Rochkind in a negative light.

The point here is that determinations respecting notions of satire, often subtle or even subliminal in nature, should be reserved for the fact-finder. This factual question is far too complex and nuanced to decide on the face of the pleadings. If a reasonable jury were to find that the NYP Article is itself a subtle piece of satire which intended to mock Rochkind rather than celebrate him, as was the case with one ordinary observer [JA-60], such finding would undermine the District Court's summary adjudication of both the first and fourth fair use factors.

In short, the District Court's summary adjudication takes for granted that the NYP Article should be treated at face value, like a news report by Walter Cronkite. That's not what this is. The NYP Article is campy, "tongue and cheek",

farcical and derisive of Rochkind.  [JA-46]  Given that reasonable minds can

differ as to readers' perception of the original NYP Article, and as to whether it

serves the same purpose as the Mic Article (which is simply more forthcoming in

its derision of Rochkind), the District Court erred in deciding the question of

transformativeness as a matter of law.

**4.      Reasonable Jurors Could Disagree About Whether Mic's Use Of The Photograph Was Transformative**

On this appeal, it is not Yang's burden to demonstrate that Mic's affirmative

defense should be dismissed.  Rather, Yang must show that the District Court erred

by resolving the fair use defense as a matter of law on the face of the pleadings,

without any development of a factual record.

Although a number of district courts in this Circuit have recently granted

motions to dismiss on grounds of fair use,[8] such cases are supposed to be the

exception, not the rule. *See Hirsch v. CBS Broad. Inc.,* No. 17 CIV. 1860 (PAE),

2017 WL 3393845, at *6 (S.D.N.Y. Aug. 4, 2017) ("whatever the theoretical

possibility of resolving fair use on a motion to dismiss, 'there is a dearth of cases

---

[8] *See, e.g., Harbus v. Manhattan Inst. for Policy Research, Inc.*, No. 19 CIV. 6124 (ER), 2020 WL 1990866, at *1 (S.D.N.Y. Apr. 27, 2020); *Schwartzwald v. Oath Inc.*, No. 19-CV-9938 (RA), 2020 WL 5441291, at *1 (S.D.N.Y. Sept. 10, 2020), *appeal withdrawn sub nom.* 2020 WL 8173575 (2d Cir. Dec. 3, 2020), *Walsh v. Townsquare Media, Inc.,* 464 F. Supp. 3d 570 (S.D.N.Y. 2020); *Boesen v. United Sports Publications, Ltd.,* No. 20 CV 1552 (ARR) (SIL), 2020 WL 6393010, at *1 (E.D.N.Y. Nov. 2, 2020), *reconsideration denied*, 2020 WL 7625222 (E.D.N.Y. Dec. 22, 2020).

granting such a motion.'") (*quoting BWP Media,* 87 F. Supp. 3d at 505).

Ultimately, the transformative inquiry turns on whether Mic created "new information, new aesthetics, new insights and understandings", *Castle Rock Entm't,*150 F.3d at 137, by re-publishing the Photograph on its Website and adding some token commentary that was derisive of Rochkind. But as demonstrated by the District Court's misapprehension of the satirical tone and meaning behind the original NYP Article's treatment of Rochkind, this case cannot be decided based on a side-by-side comparison between the two news articles. *See Hirsch*, 2017 WL 3393845, at *7 ("whether CBS's copying of the Photo was a fair use cannot be resolved with assurance on a visual comparison of the works alone").

Indeed, even where the photograph is the subject of the story, courts have still found that issues of fact remain for the jury to decide in terms of the transformative effect. In *Ferdman v. CBS Interactive Inc.,* 342 F. Supp. 3d 515, 535 (S.D.N.Y. 2018)the Honorable Paul G. Gardephe found that one of the allegedly infringing photographs of Tom Holland, the actor who plays Spiderman, was the subject of CBSi's news article because it reported on Holland's posting of the image to his Instagram account. Yet, the court determined that it could not find CBSi's use transformative as a matter of law because it was for the fact-finder to decide what new meaning or insight was imparted by CBSi's use of Holland's photograph.

reasonable jurors could disagree about whether – or the extent to which – Defendant's use of the Holland Photograph was transformative. On one hand, a jury could give weight to the importance of reporting on the fact that Holland posted the photograph himself. On the other hand, a jury could be persuaded by the argument that . . . the Holland Article used the Holland Photograph "solely to present the content of that image[ ] in a commercial capacity." <u>BWP Media</u>, 196 F.Supp.3d at 407.

*Ferdman,* 342 F. Supp. 3d at 537.

Similarly, in *Coleman v. HBO*, the Honorable Margo K. Brodie denied a Rule 12(b)(6) motion to dismiss where defendant Home Box Office ("HBO") invoked the fair use defense. HBO had used the plaintiff's painting without permission in a documentary film about a crime saga. Judge Brodie denied the motion, finding that plaintiff had "plausibly alleged that Defendants' use is not transformative." *Coleman,* 2019 WL 8645387, at *5.

Specifically, the *Coleman* court recognized that a reasonable person could ultimately find that HBO's use of the painting added something new that alters the purpose or character of the painting. But the court also observed that "while Defendants' stated purpose for the use of the Work is plausible, it is not the only plausible explanation . . . . It is plausible that Defendants used the Work in the Film solely as an illustrative aid depicting the subjects of the film, A.W., M.G., and Slenderman. This use would not be transformative." *Id.* at *6.

Here, it is entirely plausible that Mic failed to transform the image because it did <u>not</u> comment on the merits or appropriateness of the Photograph, and instead

used it as an illustrative aid to show its readers what Rochkind looks like. If the Court determines that it is plausible that Mic's use was not transformative (or only minimally transformative), then the District Court's ruling should be reversed. *Id.* at *6.

Finally, Yang respectfully avers that the District Court's analysis of the transformative inquiry was not adequately defined. The Court's inquiry into whether a secondary use is transformative is not a "black or white" or binary issue but is a question of *degree*. Some uses, such as parody, may be considered highly transformative and therefore determined as a matter of law at the pleading stage. *See, e,.g., Adjmi v. DLT Entm't Ltd.,* 97 F. Supp. 3d 512 (S.D.N.Y. 2015) (finding that off-Broadway play which mocked the television series "Three's Company" was transformative); *see also Brownmark Films*, 682 F.3d at 687.

Courts may also determine as a matter of law that secondary uses are only "minimally transformative" and therefore dismiss the fair use defense. *See Monge,* 688 F.3d at 1176 (rejecting fair use defense as a matter of law where "wholesale copying sprinkled with written commentary . . . was at best minimally transformative"); *see also Ferdman*, 342 F. Supp. 3d at 535 ("While the Court concludes that Defendant's use of the Holland Photograph is somewhat transformative, it is not so transformative as to entitle Defendant to a fair use defense as a matter of law.").

Yang respectfully avers that at the pleading stage, district courts should only resolve the crucial transformative inquiry in defendant's favor if the secondary use is shown to be *highly* transformative. But in cases involving "close calls" where there may be some degree of transformative effect (or maybe not), the District Court should properly reserve judgment until after the development of a factual record.

In this case, the District Court did not find that Mic's use was "highly transformative", because it wasn't. At best, Mic's use was minimally transformative to the extent that it outwardly attacked Rochkind, whereas the NYP Article's derision was more subtle and nuanced. But in light of Mic's commercial use and bad faith, as further explored below, the District Court erred in finding that the first statutory factor favored a determination of fair use.

5.  **A Commercial News Organization's "Incidental" Use of Registered Photographs Should Not Be Deemed Transformative**

This Court has recognized that the fair use doctrine serves as a vehicle to protect the secondary user's First Amendment rights. *See, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 190 (2003) (holding that the codified fair use doctrine under section 107 "contains built in First Amendment accommodations."); *Roy Export Co. Establishment v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1099 (2d Cir.), *cert. denied*, 459 U.S. 826, (1982) ("[n]o Circuit that has considered the

question . . . has ever held that the First Amendment provides a privilege in the copyright field distinct from the accommodation embodied in the 'fair use' doctrine."); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74–75 (2d Cir. 1999) ("First Amendment concerns are protected by and coextensive with the fair use doctrine.").

Consistent with this jurisprudence, secondary uses which are merely incidental to the defendant's communicative expression should not qualify for fair use protection. Thus, Mic's privilege to override a photographer's exclusive rights should only apply to secondary uses that are fundamental or integral to the Mic's First Amendment right to inform the public about newsworthy events.

Here, Defendant concedes that its use of the Photograph was merely "incidental" to its criticism of the New York Post and Rochkind. [JA-194] But Mic's concession demonstrates that its use of the Photograph was not essential to Defendant's right to communicate its message. The suspension of a copyright holder's exclusive rights under the fair use doctrine should be reserved for those cases where the secondary user is unable to exercise its First Amendment right in the absence of the protected copyrighted work, as was the case in *Clark* or *Campbell*.

## B.    MIC'S USE WAS COMMERCIAL

"The first statutory factor specifically instructs courts to consider whether

copyrighted materials are used for a commercial purpose or for a nonprofit

educational purpose, the former tending to weigh against a finding of fair

use." *TCA Television Corp.,* 839 F.3d at 183 (*citing Campbell,* 510 U.S. at 585

(internal quotation marks omitted).

The "crux of the profit/nonprofit distinction is . . . whether the user stands to

profit from the exploitation of the copyrighted material without paying the

customary price." *Harper & Row*, 471 U.S. at 562.  Thus, "when the copier

directly and exclusively acquires conspicuous financial rewards from its use of the

copyrighted material" a finding of fair use is less likely.  *Associated Press,* 931

F.Supp.2d at 551 (quoting *Blanch*, 467 F.3d at 253).

Here, the District Court properly concluded that Mic's use was commercial.

[JA-156]  Commercial advertisements appear adjacent to or below the Photograph

on the Website [JA 58, 61], thereby showing its commercial use.  See *Richard*

*Feiner & Co., Inc. v. H.R. Industries, Inc.*, 10 F.Supp.2d 310, 314 (S.D.N.Y. 1998)

(finding that commercial advertisements appearing alongside the unauthorized use

of photographs demonstrated a defendant's commercial purpose).

But the District Court erred by discounting the commercial nature of Mic's

secondary use. [JA-156]  As Plaintiff respectfully avers that the District Court's

analysis of the transformative effect is fundamentally flawed, as per Point I.A, *supra,* so too is the discounted weight accorded to Mic's commercial use. *See United States v. Am. Soc. of Composers Authors & Publishers*, 599 F.Supp.2d 415, 429 (S.D.N.Y. 2009) ("[A]pplicant's use of previews is not transformative, and, thus, the significance of its commercial use is not reduced, but instead takes on greater importance.").

## C.    MIC'S USE OF THE PHOTOGRAPH WAS IN BAD FAITH BECAUSE IT FAILED TO PROPERLY CREDIT YANG

"Also relevant to the 'character' of the use is 'the propriety of the defendant's conduct.'" *Harper & Row Publishers*, 471 U.S. at 562–63 (citing 3 Nimmer § 13.05[A], at 13–72). "As the term itself suggests, '[f]air use presupposes good faith and fair dealing.'" *Associated Press,* 931 F.Supp.2d at 552 (*citing Harper & Row*, 471 U.S. at 562 (quoting Schulman, Fair Use and the Revision of the Copyright Act, 53 Iowa L.Rev. 832 (1968)).

Thus, in weighing the first factor, the Court may also consider "the propriety of a defendant's conduct." *NXIVM Corp.,* 364 F.3d at 478 (citations omitted); see also *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1203 (Fed. Cir. 2018), *cert. granted*, 140 S. Ct. 520, 205 L. Ed. 2d 332 (2019) ("bad faith may weigh against fair use")

Here, the District Court properly determined that Defendant plausibly acted in bad faith. [JA-156]  Mic's bad faith is evidenced by the fact that Mic failed to provide Yang's attribution in connection with its display of the Photograph over multiple media platforms (even though it knew that Yang was the copyright holder).  Mic expropriated the Photograph directly from the NYP Article, which featured a clear gutter credit identifying Yang as the photographer. [JA-40, ¶ 16; JA-46]  As a sophisticated media company in the business of publishing copyright-protected content, Mic was aware of the gutter credit on the NYP Article, and Mic understood the gutter credit indicated that the Photograph was owned by Stephen Yang. [JA-40, ¶ 17]  Despite the gutter credit, Mic did not contact Yang or the New York Post for authorization to use the Photograph. [JA-40, ¶ 18]  Moreover, Mic Network failed to credit Yang when it re-published the Photograph on the Website [JA-57] or its Facebook Page. [JA-63]

Mic's repeated omission of any credit to Yang demonstrates Mic's bad faith in its multiple uses of the Photograph. *See Hirsch*, 2018 WL 6985227, at *6 (rejecting fair use defense and finding that news organization's omission of photographer's authorship credit provided an inference of bad faith); *Marcus v. Rowley,* 695 F.2d 1171, 1175–76 (9th Cir.1983) (no attempt to credit copyright owner weighs against fair use); *accord Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992) (finding that defendant's "action [in tearing the copyright mark off of

the original work] suggests bad faith in defendant's use of plaintiff's work, and militates against a finding of fair use.").

Mic's brazen failure to credit Yang as the author of the Photograph, even though it knew Yang was the copyright holder, should strongly militate against a finding of fair use, which itself is an "equitable doctrine", *Rogers*, 960 F.2d at 309 that "presupposes good faith and fair dealing." *Associated Press,* 931 F.Supp.2d at 552.

## <u>POINT II</u>:   YANG'S PHOTOGRAPH IS CREATIVE AND SHOULD BE ACCORDED APPROPRIATE WEIGHT

The second statutory factor examines the "nature of the copyrighted work." 17 U.S.C. § 107(2).  As the Supreme Court has observed, certain "works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *TCA Television Corp.*, 839 F.3d at 184.

In analyzing the second factor, the Court considers "(1) whether the work is expressive or creative, with a greater leeway being allowed a claim of fair use where the work is factual or information, and (2) whether the work if published or unpublished." *Blanch*, 467 F.3d at 256.

"The mere fact that the original is a factual work . . . should not imply that others may freely copy it," as "authors of factual works, like authors of fiction, should be entitled to copyright protection of their protected expression." *Authors*

*Guild v. Google, Inc*., 804 F.3d 202, 220 (2d Cir. 2015), *cert. denied*, 136 S. Ct.

1658 (2016). "Photographic images of actual people, places and events may be as

creative and deserving of protection as purely fanciful creations." *Monster*

*Communications, Inc. v. Turner Broadcasting*, 935 F.Supp. 490, 494 (S.D.N.Y.

1996); *see also Baraban v. Time Warner*, No. 99-cv-1569 (JSM), 2000 WL

358375 at *4 (S.D.N.Y. April 6, 2000) ("Although photographs are often 'factual

or informational in nature,' the art of photography has generally been deemed

sufficiently creative to make the second fair use factor weigh in favor of

photographer-plaintiffs.");

　　Here, the image of Rochkind is creative because it is not merely a candid

factual shot in a public setting, but an artfully composed posed portrait, which is

considered more creative than a simple "point-and-shoot" of a public

event. *Compare Morris v. Guetta*, 2013 WL 440127, *10 (CD. Cal. Feb. 4,

2013) ("a posed portrait" is considered more aesthetic even where the subject

matter is documentary) *with Katz v. Google Inc.,* 802 F.3d 1178, 1183 (11th Cir.

2015) (holding photo at issue was factual or informational because it was "merely

a candid shot in a public setting").

　　The District Court found that the Photograph is creative because it was a

posed portrait. [JA-157] Yet, it discounted overall weight given to the second

factor.  [*Id.*]  In short, even though the Photograph was published before Mic expropriated it, this factor weighs against fair use.


## POINT III: MIC USED MORE OF THE PHOTOGRAPH THAN WAS NECESSARY

The third factor bearing on fair use asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *Campbell,* 510 U.S. at 586 (quoting 17 U.S.C. § 107(3)). In assessing this factor, the Court considers not only "the quantity of the materials used" but also "their quality and importance." *Id.* at 587.

The Court should also consider whether the portion taken is "essentially the heart" of the copyrighted expression. *NXIVM Corp.*, 364 F.3d at 480 (citation omitted). The "most relevant" question for this factor is whether the infringer has taken "no more" than is necessary. *Infinity Broadcast Corp.*, 150 F.3d at 110. "[T]he more of a copyrighted work that is taken, the less likely the use is to be fair." *Id.* at 109.

As a quantitative matter, Defendant took roughly half of the Photograph, cropping out the lower portion below Rochkind's chest.  [JA-57]  The key elements of the Photograph, namely Rochkind's face and the setting were all left unchanged.  [*Id.*]  Mic has, therefore, taken "essentially the heart" of the

copyrighted expression. *NXIVM Corp.*, 364 F.3d at 480 (citation omitted); *see also Monge,* 688 F.3d at 1178 (the minimal cropping of each picture demonstrates that the 'heart' of each individual copyrighted picture was published.").

In addition, Mic used the Photograph multiple times across multiple on-line platforms. Not only was it displayed in the headline to the Mic Article [JA-57], but it was also displayed in the embedded posts. [JA 58, 60] Further, the Photograph was displayed on an entirely separate URL operated by Mic, namely Mic's Facebook page [JA-63], a critical fact that the District Court did not evaluate. The fact that Mic used the Photograph as a banner image on two separate URLs demonstrates that it took more than was necessary to convey its message.

As a qualitative matter, Defendant has used more of the copyrighted work than was necessary to accomplish its purpose of news reporting. *See Rogers*, 960 F.2d at 311. The Photograph was reproduced by Defendant in full color without any visible modification, other than cropping. Defendant's reproduction of the Photograph, without any significant aesthetic alteration, demonstrates the image's qualitative value. *See Harper & Row*, 471 U.S. at 565 ("the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression.").

Moreover, Defendant's copying of the Photograph was unnecessary to

achieve Defendant's news reporting purpose. As noted by Judge Easterbrook in *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014), "[t]he fair-use privilege under § 107 is not designed to protect lazy appropriators." In this case, there were at least five legal alternatives available to Defendant which did <u>not</u> include the "lazy appropriation" of Yang's work: (1) Defendant could have published its news story with only the Twitter embeds, showing multiple instances of the Photograph and perfectly illustrating both the controversy and Mr. Rochkind himself; (2) Defendant could have used the share and/or link icons at the top the New York Post Article to share and comment on the story; (3) Defendant could have published its news story *without* any photograph whatsoever; (4) Defendant could have commissioned its own photographer to take an original photograph of Rothkind; or (5) Defendant could have obtained a license directly from Yang, who was clearly identified and could have easily been contacted.

Mic cannot provide any explanation for why its use of the Photograph was necessary or how it served Defendant's purpose better than the alternative means that did not rely on exploiting Plaintiff's copyrighted work. By opting to expropriate Yang's photographic expression, Defendant has taken more than what was "necessary" to effectuate its news reporting purpose, and accordingly the third factor weighs heavily in Plaintiffs favor. *See Psihoyos*, 1998 WL 336655, at *4 (defendant "was simply using the [plaintiff's] photo to save itself the expense of

obtaining its own photo").

The District Court rejected these arguments, finding that Mic's use of the Photograph as a banner image was necessary to identify the NYP Article and "it is not plausible that Mic could have achieved the same effect by burying the lede in embedded tweets." [JA-158, 159]   The District Court also found that an alternate photograph of Rochkind would not suffice to achieve Mic's alleged transformative use. [JA-159]

The District Court also again relied on *Clark* for the proposition that Mic's use of a composite screenshot was necessary to identify the NYP Article. [JA-159] However, as noted in Point I.A.2, *supra*, *Clark* is distinguishable because the defendant in that case used a composite screenshot to criticize the New York's Post editorial selection of the photograph at issue, which is not the case here.

In short, the District Court's analysis of the third factor is not sustainable because its finding with respect to the first factor is flawed, see Point I.A., *supra*. It was premature for the District Court to assess this factor in light of the factual disputes concerning Mic's purpose for using the Photograph. *See, e.g., N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 621 n.18 (S.D.N.Y. 2015) (stating that the third factor of the fair use analysis is dependent on the purported purpose of the copyrighted work's use, and declining to assess the third factor because an issue of fact existed as to the first factor); *May v. Sony Music Entm't*, No. 18-CV-

2238, 2019 WL 2450973, at *14 (S.D.N.Y. Feb. 13, 2019) (declining to assess the

third factor "without further development of the record examining what [the

d]efendants sought to accomplish and how they did so").

## POINT IV: MIC'S UNAUTHORIZED USE PLAUSIBLY CAUSED MARKET HARM

The final fair use factor considers "the effect of the use upon the potential

market for or value of the copyrighted work." 17 U.S.C. § 107(4).  The Supreme

Court declared in *Harper & Row* that "[t]his last factor is undoubtedly the single

most important element of fair use." 471 U.S. at 566 (footnote and citation

omitted).

The fourth factor "requires courts to consider not only the extent of market

harm caused by the particular actions of the alleged infringer, but also whether

unrestricted and widespread conduct of the sort engaged in by the defendant would

result in a substantially adverse impact on the potential market for the original."

*Ringgold*, 126 F.3d at 80-81 (*citing Campbell*, 510 U.S. at 590 (quotation

omitted)).

A copyright owner is not required to show that actual harm has come to her,

*Sony Corp.*, 464 U.S. at 451, but must show merely a "potential" effect on the

market for the copyrighted work. *Harper & Row*, 471 U.S. at 568–69.  The Court

therefore properly considers the challenged use's "impact on potential licensing

revenues for traditional, reasonable, or likely to be developed markets." *American Geophysical Union*, 60 F.3d at 930; *accord Swatch Grp. Mgmt. Servs.*, 756 F.3d at 91. Accordingly, "to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." *Id.*

Here, the District Court improperly determined that "even assuming there were a market in licensing the Photograph and drawing all available inferences in Plaintiff's favor, it is implausible that such a market would be supplanted by Defendant's use." [JA-160] Not unlike the case in *TCA Television*, the District Court "disregarded the possibility of defendants' use adversely affecting the licensing market for the" Photograph. *TCA Television Corp.,* 839 F.3d at 186 (citing *Cariou*, 714 F.3d at 708 (stating that fourth factor "does not focus principally on the question of damage to [a] derivative market")).

Mic's secondary use clearly impairs the actual market for the Photograph because there was a fully functioning market demand for the Photograph. *See Associated Press*s, 931 F.Supp.2d at 559 ("Where there is a fully functioning market for the infringer's use of the copyrighted material, it will be difficult for the infringing party to show that it made fair use without paying a licensing fee") (citing *Harper & Row*, 471 U.S. at 566 n. 9).

To begin with, Yang is a professional photojournalist who licensed the Photograph to a major newspaper, the New York Post. [JA- 38, ¶¶ 5, 8] Defendant is a for-profit media organization that derives substantial revenues from advertising on the Website that is determined, in large part, by the number of page-views or "clicks" the Website receives. [JA-40, ¶ 22]

It is plausible that since the New York Post and Mic are both news media organizations, and both publish lifestyle-related news, that they occupy parallel markets and share the same demographic of readers, particularly on-line. Accordingly, by expropriating the Photograph from the New York Post and failing to obtain a license from Yang, Mic has usurped the market for the Photograph. *See NXIVM Corp.*, 364 F.3d at 481-82 ("[O]ur concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.")

Yang is entitled to collect licensing fees in whatever reasonably expected markets may exist, particularly in the context of commercial news reporting. As per *Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177 (D. Mass. 2007):

> CBS's use of the photographs is paradigmatic of the only market the photographs could reasonably have: licensing to media outfits . . . . The market for media licenses for these photographs clearly exists, and is the only market in which the photographs have seen use: Various media outfits have used the photographs more than 20 times, resulting in over $60,000 in fees and settlements for exactly this kind of use… If the Court finds that

CBS's use was fair use, then all of these media uses—and uses like them in the future—would also be fair use, destroying the only potential market that exists for the photographs. It is hard to imagine that freelance photojournalists would continue to seek out and capture difficult to achieve pictures if they could not expect to collect any licensing fees. This is exactly the kind of situation that copyright is meant to impact—where unrestricted use would likely dry up the source."

491 F. Supp. 2d at 189; *accord Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 508–09 (S.D.N.Y. 2018) ("'the inquiry [of the fourth factor] looks to whether infringement will affect the *potential* market for the copyrighted work in "traditional, reasonable, or *likely to be developed* markets.")" (citation omitted).

Here, if Yang cannot collect licensing revenues from media companies such as Mic who seek to exploit his work to report on whatever the New York Post is reporting, then he is essentially relegated to a single license fee for initial publication. This can't be right.

As Judge Woods noted in *Otto v. Hearst:*

Publishing the Photograph without permission essentially destroys the primary market for its use. As the owner of the work, Otto had the right to try to sell the Photograph to media outlets, if he decided to do so. The fact that the Photograph was reported on so widely indicates that there was indeed a market for it. Hearst has done nothing to show that the general audience for Otto's photograph would not be equally satisfied with its version. Thus, the publication can reasonably be expected to harm Plaintiff's ability to license the work for publication and use in derivative works. Because the images are nearly identical, Defendant's unauthorized publication impacts the market for the work—simply put, more supply, less demand.

*Otto,* 345 F. Supp. 3d at 432–33 (underline added).

In this matter, the public record shows that scores of other media outlets criticized or commented on the NYP Article in very much the same manner as Mic. *See, e,g.*, *Yang v. Onion, Inc.,* 17-cv-5411-VEC; *Yang v. Connected Ventures,* 17-cv-5481-GBD; *Yang v. Evolve Media,* 17-cv-5529-AJN; *Yang v. Ziff Davis,* 17-cv-6628-VSB*; Yang v. Guardian,* 17-cv-6636-GBD; *Yang v. Oath;* 17-cv-6728-VM*; Yang v. Uproxx,* 17-cv-6880-JPO*; Yang v. Someecards* 17-cv-7405-JFK; *Yang v. Hearst* 17-cv-7585-VEC. [JA-172]

The widespread commentary on the NYP Article demonstrates that a robust market existed in which Yang could be reasonably expected to collect fees. *Otto*, 345 F. Supp. 3d at 432–33 ("The fact that the Photograph was reported on so widely indicates that there was indeed a market for it.")

If the District Court's holding is allowed to stand, it would effectively relegate Yang to a single licensing fee while permitting all other news publishers to free-ride off Yang's labor. *See, e.g.*, *BWP Media USA*, 196 F. Supp. 3d at 406 n.6 ("Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.").

Further, the concept that so-called "viral" photographs lose copyright protection on grounds that downstream infringers enjoy the privilege to add their

two cents of commentary is counter-intuitive. For example, when a musical work or motion picture become popular, that doesn't give others the right to exploit that hit song or blockbuster movie with impunity. When a copyright holder's work achieves widespread popularity, that typically signals a "pay day", allowing that copyright holder to reap the fruits of her labor. But for some inexplicable reason, photographers are increasingly being boxed out of their own success through operation of the fair use doctrine, which permits free exploitation of "viral" photographs. Yang respectfully submits that the Court should take this opportunity to correct this unfortunate trend.

Finally, the District Court's reliance on "composite screenshots" to support its analysis of the fourth factor is erroneous. The District Court determined that because Mic used a screenshot of the NYP Article, which included the headline and a cropped version of the Photograph, rather than a stand-alone version of the Photograph that "it is implausible that potential purchasers would opt to use the Screenshot rather than license the original Photograph." [JA-160]

But the District Court's conclusion misses the point of the fourth factor, which is to ensure that downstream infringers do not usurp the market for the original work. *NXIVM Corp.*, 364 F.3d at 481-82. As a preliminary matter, by creating the composite screenshot, Mic deprived Yang of the licensing revenue he reasonably expected to receive from Mic's exploitation of his work.

Even more troubling is that the District Court carved out a loophole for downstream infringers who seek to perform a technical end-run around the protections afforded by the Copyright Act. Under the District Court's ruling, to avoid obtaining a license from a professional photojournalist, a downstream infringer merely needs to create a composite screenshot which includes the photograph and some text. Such a simple work-around mechanism will facilitate outright theft and should not be upheld.

In this case, it is plausible that Mic created a composite screenshot for the sole purpose to avoid having to obtain a license from Yang. Mic wanted to use the Photograph, but did not want to pay for it. By creating a composite, Mic reaped all the commercial benefits from exploiting Yang's work without providing him compensation or credit.

Had Mic been required to obtain its own original photograph of Rochkind, it would have expended substantial time and money to arrange a photoshoot. Had Mic sought to obtain a license from Yang for his pictorial rendition of Rochkind, it would have had to pay a licensing fee and engage in the transactional cost of contacting Yang to obtain such license. Mic avoided that time and expense by quickly creating a "composite screenshot" of the NYP Article to capitalize on the newsworthy moment; yet gave no consideration in return.

In short, Plaintiff repectfully requests that the Court reject the "composite screenshot" theory pronounced by the District Court, as well as by *Clark*, because it fails to account for the loss of licensing revenue from the alleged infringer, and promotes widespread infringement through technical end-runs.

## POINT V:  THE DISTRICT COURT DID NOT PROPERLY WEIGH THE FOUR STATUTORY FACTORS

Plaintiff respectfully avers that the District Court's consideration of the totality of factors [JA-161] is flawed because its assessment of the first, third and fourth factors is not sustainable.

Mic's secondary use was not transformative because it primarily used the Photograph as an illustrative aid to comment on the subject matter depicted in the image: Rochkind.  The Photograph itself was not the subject of Mic's story nor target of any criticism. At best, Mic has shown that its use was minimally transformative because it cropped out the lower half of the Photograph.  But such low degree of transformativeness does not justify a fair use finding as a matter of law.

More importantly, the first factor presents a question of fact for the jury as to whether Mic imparted any new meaning or insight through use of the Photograph, particularly given that a reasonable juror could find that the NYP Article was satirical in its own right rather than a "serious" piece of news reporting.  Although

the District Court found that Mic's use was commercial and in bad faith, it did not balance those factors into its final analysis. [JA-160, 161]

The District Court also accorded insufficient weight to the second factor, even after finding that it weighed against fair use. The District Court's analysis of the third factor did not take into account the multiple uses of the Photographs across several URLs [JA-57, 63], nor did it take into account the qualitative copying made by Mic, showing that it valued the Photograph.

Finally, the District Court entirely overlooked the widespread popularity of the Photograph, demonstrating a robust market demand for Yang's work. By allowing Mic to escape liability through use of a composite screenshot, Yang was not only deprived of a proper licensing fee from Mic, but the District Court provided downstream infringers a convenient technical mechanism to avoid paying license fees through the snap creation of strategic screenshots.

## POINT VI: THE DISTRICT COURT OVERLOOKED MIC'S USE OF THE PHOTOGRAPH ON FACEBOOK

Even if the Court were to find that Mic's use of the Photograph as a banner image on its Website constitutes fair use as a matter of law, remand of this case is warranted in light of the District Court's failure to consider Mic's infringing use of the Photograph on its commercial Facebook page, which was attached as Exhibit E

to the Amended Complaint [JA-63] and addressed within the body of the Amended Complaint. [JA-39, ¶12; JA-40, ¶¶ 20-21]

Mic's use of the Photograph on Facebook, an entirely different URL, demonstrates that the primary elements cited by the District Court in support of its transformative inquiry, such as mocking Rochkind or portraying Rochkind in a negative light, are not present. Other than Mic's article headline, there is no accompanying text or commentary at all. [JA-63] Instead, Mic used the Photograph on Facebook essentially as a commercial advertisement to drive traffic to its Website. [JA-40, ¶¶ 20-21]

Under these circumstances, the Court should remand the case for further proceedings to determine whether the Facebook use qualifies as fair use.

## CONCLUSION

Based on the foregoing, Plaintiff Stephen Yang respectfully submits that the District Court's overly broad and premature application of the fair use doctrine should be rejected, and the Court should reverse the District Court's order dismissing the case under Fed.R.Civ.P. 12(b)(6) and remand this case for further proceedings.

Dated: March 17, 2021
Valley Stream, New York

Respectfully submitted,

**/s/jameshfreeman/**
James H. Freeman
LIEBOWITZ LAW FIRM, PLLC
11 Sunrise Plaza, Ste. 305
Valley Stream, New York 11580
(516) 233-1660

*Counsel for Plaintiff-Appellant*
*Stephen Yang*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 13,759 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.


Dated:          March 17, 2021
                Valley Stream, New York


                                        By:    <u>/s/</u>jameshfreeman/
                                               James H. Freeman



Appellate Source, Inc.

Simplified. Appellate. Solutions.

85 West Main Street, Suite 201, Bay Shore, NY 11706
631-647-0654 – www.appellatesource.com